UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA


| | | |
|---|---|---|
| ADVANCED TACTICAL ORDNANCE | ) | |
| SYSTEMS, LLC, an Indiana limited liability | ) | |
| company, (d/b/a PepperBall Technologies), | ) | 1:12-CV-296-JVB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REAL ACTION PAINTBALL, INC., and | ) | |
| K.T. TRAN, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |


**OPINION AND ORDER**

Plaintiff, Advanced Tactical Ordnance Systems, LLC, ("ATO") sued Real Action

Paintball, Inc. ("RAP4"), and K.T. Tran (and others who have now been dismissed) alleging

trademark infringement and various state law violations.

On September 7, 2012, the Court granted Plaintiff's motion for a Temporary Restraining

Order, enjoining Defendants from manufacturing, advertising, selling, or otherwise using

projectiles filled with pepper powder that are generally used in military or law enforcement

operations. On September 26, 2013, and again on October 3, 2012, at the request of Defendants

K.T. Tran and RAP4, the Court modified the TRO to narrow its scope so as to allow Defendants

to continue selling products that were clearly outside the scope of Plaintiff's trademark

infringement claims. Since then, with the consent of the parties, the TRO has been extended

numerous times to allow the parties to conduct discovery regarding Plaintiff's motion for

preliminary injunction. The extensions were also made to accommodate the parties' schedules in

1

presenting their case to the Court in a series of evidentiary hearings. Now, having heard and

reviewed all the evidence relating to Plaintiff's motion for preliminary injunction and having

considered the applicable laws, the Court sets forth its findings of fact and conclusions of law.


I.

At the outset the Court notes several matters regarding the procedural stature of the case,

the conduct of the parties and their attorneys, and the credibility of the witnesses.

On December 14, 2012, Plaintiff amended its motion for preliminary injunction. On

December 18, 2012, the Court issued an order stating that the any further amendments to the

Plaintiff's motion for preliminary injunction must be made by January 18, 2013.

On June 3, 2013, the Court concluded a series of evidentiary hearings regarding

Plaintiff's amended motion for preliminary injunction and set forth the briefing schedule. On the

day that Plaintiff's brief in support of its motion was due, without leave of Court, Plaintiff filed

the Second Amended Motion for preliminary injunction (DE 323). Defendants rightfully

objected to this amendment and seek that it be stricken. However, having reviewed the

memorandum accompanying the motion, the Court finds no substantive differences between the

second amended motion and the first amended motion. As a matter of procedure the Court

strikes Plaintiff's second amended motion (DE 323), but not the brief accompanying it, which

equally applies to the first amended motion for preliminary injunction.

From the beginning, this has been an extremely contentious case. Neither the parties nor

the attorneys get along with each other. There have been multiple accusations against everyone

involved in this case and numerous motions for sanctions from both sides that request anything

from the dismissal of the case to the granting of default judgment. The Court will address these motions in separate orders.

Additionally, in less than a year, this case has garnered almost 350 docket entries, many accompanied by voluminous filings. As the Court noted before, a great number of these entries are related to petty motions by both sides, regarding matters that should be easily resolved by the attorneys without the Court's involvement. These filings have overwhelmed the Court and are neither helpful to the administration of this case nor conducive to the orderly litigation of the matters before it.

Finally, having heard the testimony of K.T. Tran and Omar Macy in person, the Court finds that these witnesses lack credibility almost entirely. It was not so in the beginning. As the evidentiary hearings began, Mr. Tran appeared sincere and perhaps overwhelmed with the scope of the lawsuit filed against him and his company. Soon, however, it became clear to the Court that his demeanor was an act and that he had no problems with twisting the truth or lying outright. The Court found his testimony regarding the meaning of the term "acquisition" that he used in the announcement of projectile sales especially troubling. His account that he thought the term "acquisition" meant a contract with Conrad Sun to sell projectiles is plainly incredible and his hiding behind the fact that English is his second language (which he appears to speak and write quite well) shameful.

Likewise, Mr. Tran's testimony as to the steps he took to comply with the Court's Temporary Restraining Order when confronted with the alleged violations entirely lacks credibility. If anything, his testimony established that Defendants were trying to appear to be complying with the letter of the law, while using every outlet possible to undermine the status quo of the case that the order meant to implement.

As to Omar Macy, an officer of Defendant RAP4, the Court found him arrogant, evasive, and too eager to twist the truth in Defendants' favor. Very little, if anything of his testimony could be taken at face value.

On the other hand, while Plaintiff's officers appear to have chosen to use this lawsuit not to merely prevent unfair competition but to also maintain their monopoly in pepper powder projectiles, their testimony agreed with other evidence in this case and the Court finds them largely credible.

With these things in mind, the Court moves on to the merits of Plaintiff's amended motion for preliminary injunction.

## II.

Plaintiff, a corporation based in Fort Wayne, Indiana, manufactures and sells PepperBall branded equipment including PepperBall projectiles. Live PepperBall projectiles are small plastic spheres that are red or half red/half black, and contain an irritant powder that functions similar to pepper spray. PepperBall projectiles are used by police and governmental agencies, militaries, and private security firms as a non-lethal force compliance tool. Plaintiff's half owner, Perfect Circle Projectiles, developed and has manufactured the majority of the projectiles sold by PepperBall Technologies since the late 1990s.

Plaintiff acquired all the tangible and intangible assets of PepperBall Technologies---including PepperBall's trademarks, goodwill, and trade secrets---when Plaintiff foreclosed on the loans it had purchased and was the successful bidder at the January 9, 2012, public sale Plaintiff conducted. No one with standing to complain about how the sale was conducted has complained. Plaintiff's owners took steps to ensure a seamless transition between owners, including keeping

4

most of the employees, trainers and suppliers. PepperBall Technologies was at all times

reachable by phone, e-mail, and via its website. PepperBall Technologies shipped all orders to its

customers on time and there was never a shortage of product during Plaintiff's ownership of

PepperBall Technologies or the transition period.

Plaintiff was and is the sole manufacturer of a spherical irritant powder filled projectile in

the United States. Plaintiff and its authorized distributors are the sole source for PepperBall

projectiles in the United States, and dominated the domestic market for irritant powder filled

projectiles.

RAP4 sells paintball guns and related items through its interactive website. Defendant

Tran is its owner and chief executive officer. Customers use RAP4's website to place orders for

merchandise. In placing their orders, the customers enter into a legal agreement with RAP4

where, among other things, they consent to receiving "certain communications . . . , such as

service announcements, administrative messages and the RAP4 Newsletter" and acknowledge

"that these communications are considered part of RAP4 membership and [they] will not be able

to opt out of receiving them."  RAP4 has reserved for itself the right "under certain

circumstances and without prior notice, [to] immediately terminate" the customers' access to

service. "Cause for such termination shall include, but not be limited to, (a) breaches or

violations of the TOS [Terms of Service] or other incorporated agreements or guidelines . . . ."

(Tiberius Decl. ¶ 7 and its Ex. A-8.)

RAP4 sends its customers, including those in Indiana, about one email a week.

During the second week of August 2012, Defendant RAP4 posted on its, and other,

websites---and sent out blast e-mails that some Indiana residents and several of Plaintiff's

employees and customers received---the following statement:

RAP4 is proud to announce the acquisition of machinery, recipes, and materials once used by PepperBall Technologies Inc., the manufacturer of Less Lethal Live Rounds that are trusted by law enforcement and military units far and wide. Now we manufacture our Less Lethal Live Rounds directly, on that original machinery, and conforming to the original specifications, to provide our customers with improved quality control and uninterrupted supplies. With the inspiring success and service-proven track record of our Less Lethal Launchers, comes the need for high-quality, highly effective less lethal ammunition like that originally manufactured by PepperBall Technologies Inc.

Earlier this year, PepperBall Technologies Inc.  was liquidated and foreclosed by their creditors. RAP4 acted immediately through acquisition and resume [sic] the machinery, recipes, and materials required to continue production of our Less Lethal Live Rounds. That means we have direct oversight of quality control, and the ability to keep producing those less lethal live rounds that have proven themselves as invaluable tools time and again.

Now we can also introduce dynamic new tools for our less lethal customers based on their demand and our cutting-edge research. Recently we launched an exciting new product, the Max Payload Less Lethal Live Round, which is built to the same dimensions, weight, and quality standards as the original Less Lethal Live Round...but is formulated to contain ten times the amount of active ingredient – meaning their ballistics and reliability are the same while their irritant payload is ten times more powerful than standard Live Rounds.

With PepperBall Technologies Inc.'s equipment, recipes, and standards integrated into our manufacturing, we will be able to offer even more innovations . . . and an uninterrupted supply of the less lethal rounds that our police and military customers need! RAP4 is dedicated to your success.

While creating the impression that RAP4 was the new PepperBall projectile

manufacturer, the statement was false. None of the Defendants in this matter acquired anything

from PepperBall Technologies. RAP4 did not manufacture its Less Lethal projectiles, Conrad

Sun, LLC/ Sun did, and they began supplying RAP4 with them after entering into a contract to

do so.  RAP4 merely purchased the Sun projectiles from APON and the extent of RAP4's input

into their manufacture was selecting the color of the projectile shell they wished to use.

Defendant Tran made his choice of colors, after consulting with Sun, and decided to use the

same colors as PepperBall Technologies, Inc., and ATO thereafter, had used for each authentic

PepperBall since the introduction of the product. Defendant Tran consciously and deliberately

chose to copy the PepperBall color scheme after Sun advised "if you want to compete with

PepperBall, I would stay with their colors." However, as the e-mails introduced into evidence

show, Mr. Tran did not merely want to compete with PepperBall; he wanted to pass off the

APON shells as being authentic PepperBall projectiles.

 While Defendants' message was accurate that PepperBall Technologies had ceased

operations, based on the rest of the message the Defendants' intent was to cause consumers to

think that RAP4 was the new source for authentic PepperBall projectiles previously

manufactured and sold by PepperBall Technologies.

Following the announcement on RAP4's website and its emails on the same subject

matter, Plaintiff received e-mails and phone calls from its customers and distributors who were

confused about Plaintiff's status and whether Defendant RAP4 was selling authentic PepperBall

projectiles.

Plaintiff's attorneys then contacted K.T. Tran and demanded that the statement be

retracted. In response, RAP4 replaced the original statement on its website with the following:

> RAP4 Less Lethal Live Rounds are produced by the original OEM manufacturer that
> once produced for PepperBall Technologies Inc. In 2012, PepperBall Technologies Inc.
> was liquidated and foreclosed and now PepperBall technologies Inc. and brands belong
> to Phoenix International LLC. Because of this reason RAP4 and original OEM
> manufacturer have been able to team up and have improved the formula and process for
> making Less Lethal Live Rounds. Now RAP4 is able to guarantee the highest-quality
> products and provide continuous availability.

In addition, RAP4 sent this statement in another email broadcast. The Indiana residents

who received the first email also received this email. Also, in one form or another, both

messages were communicated by RAP4's employees on other websites related to the use of

powder filled projectiles. This was the last official and public statement from RAP4 regarding this matter.

Meanwhile, RAP4 was selling the pepper powder projectiles assembled by APON---albeit without PepperBall trademark inscribed on them---that looked to an ordinary observer identical to the authentic PepperBall projectiles then being sold by Plaintiff. Plaintiff also presented evidence that, in addition to website representations and emails to its customers,  RAP4 delivered several orders of counterfeit  PepperBall projectiles to Indiana residents. (Tiberius Decl. ¶ 11 and Ex. A-14 & Ex. B.)

Plaintiff presented evidence that RAP4's projectiles, despite the likeness to the PepperBall projectiles, were inferior in quality. Plaintiff has significant quality controls in place to ensure projectiles are of a consistent weight, while those from RAP4 varied by 36%. In addition, RAP4's projectiles leaked the powder during shipments at least in three different instances. In all, RAP4's projectiles do not have the same quality controls and could tarnish Plaintiff's reputation to an unsuspecting consumer.

## III.

Defendants have challenged this Court's personal jurisdiction over them, claiming that their contacts with Indiana are insufficient under Indiana's long arm statute. The Court stated orally at the December 7, 2012, hearing that it could properly exercise jurisdiction over Defendants, and, in light of the now completed evidentiary hearings, the Court reaffirms its ruling.

Plaintiff bears the burden of demonstrating personal jurisdiction. *See RAR, INC. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). A district court sitting in diversity has

personal jurisdiction over a nonresident defendant only if a court of the state in which it sits

would have jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 779

(7th Cir. 2003). Indiana's Trial Procedure Rule 4.4(a) permits jurisdiction on any basis allowed

by the requirement for due process. [1] Due process requires that a nonresident defendant have

certain "minimum contacts" with the forum such that "traditional notions of fair play and

substantial justice are not offended." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

"The crucial question is whether the defendant's contacts with the state are such that he should

reasonably anticipate being haled into court there." *Int'l Med. Group v. Am. Arbitration Ass'n,*

312 F.3d 833, 846 (7th Cir. 2002). "General jurisdiction" and "specific jurisdiction" are two

criteria that allow personal jurisdiction over distant defendants.

General jurisdiction exists "where the defendant has 'continuous and systematic general

business contacts' with the forum." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th

Cir. 1997) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8

(1984)). Specific jurisdiction exists when the plaintiff's claims relate to, or arise out of, the

defendant's contacts with the forum. *Id*.

The Court finds that it can exercise personal jurisdiction over Defendants on the basis of

specific jurisdiction. Plaintiff has sufficiently demonstrated that RAP4, through Tran's initiative

and leadership, actively directed its activity to several Hoosiers and thus harmed Plaintiff in

Indiana. Whereas even a single tortious contact with the forum state may be enough, *see Anthem

Ins. Co., Inc. v. Tenet Healthcare Corp.*, 730 N.E.2d 1227, 1235 (Ind. 2000), here Defendants

sent at least two email broadcasts to Indiana residents misleading them about the ownership of

---

[1] 34 Ind. Admin. Code 4.4 (West 2011) ("[A] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States.")

PepperBall trademark. Furthermore, RAP4 fulfilled several orders of the allegedly infringing projectiles. These email solicitations and sales of counterfeit projectiles to Indiana residents constituted the kinds of actions that accorded Defendants the protection of Indiana law, also subjecting them to the jurisdiction of the courts in Indiana. Defendants knew that Plaintiff was an Indiana company and it could foresee that misleading emails and sales of allegedly infringing product to Indiana residents would harm Plaintiff in Indiana.

Moreover, as is clear from RAP4's customer agreement to which a purchaser of its products had to consent, RAP4's control over its Indiana paying customers was not merely peripheral but was designed to create an economic advantage over its competitors such as Plaintiff. This, together with the interactive nature of RAP4's website, as well as its tortious acts in the form of emails and sales to Indiana residents, give rise to Court's personal jurisdiction over RAP4 and Mr. Tran, who directed RAP4 to cause harm to Plaintiff in Indiana.

The Court denies RAP4 and K.T. Tran's motion to dismiss for lack of jurisdiction.


IV.

A.  **Plaintiff Has Established Defendants Engaged in Trademark Infringement**

In order to establish trademark infringement, a plaintiff needs to prove "that (1) [its] mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers." *Packman v. Chi. Tribune Co.*, 267 F. 3d 628, 638 (7th Cir. 2001) (citing *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir.2000)). Once a "mark [is] registered on the principal register . . . [it] shall be prima facie evidence of the validity of the registered mark." *Id*. Once a trademark is incontestable, while it may be cancelled if the challenger demonstrates the mark has become generic, an incontestable mark is conclusively presumed to be non-

descriptive (i.e., the mark is at least suggestive, if not arbitrary or fanciful), or if the mark is

descriptive, that it has acquired secondary meaning, without further proof. *See Union Carbide*

*Corp. v. Ever-Ready Inc.*, 531 F. 2d 366, 377 (7th Cir. 1976). Here it is not only undisputed that

"PepperBall" is a registered trademark, but that it is incontestable under 15 U.S.C. § 1065, and is

owned by the Plaintiff.

While Defendants have challenged the validity of the sale of the assets of Pepperball

Technologies Inc., they have not demonstrated that, even if the sale proves to be invalid, Plaintiff

would not be the rightful owner of the trademark. To the contrary, under California law, if the

sale was invalid, they may be liable for monetary damages, but they would not have to surrender

the trademark.

Since Plaintiff's ownership of the PepperBall trademark is legitimate, the only remaining

issue is whether the Defendants' use of the mark likely caused confusion among consumers. The

Court finds it did.

There are seven factors the Court considers:

> (1) similarity between the marks in appearance and suggestion; (2) similarity of the
> products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised
> by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of
> the defendant to "palm off" his product as that of another. *See Ty, Inc. v. Jones Group,
> Inc.*, 237 F.3d 891, 897-98 (7th Cir. 2001). No single factor is dispositive, and courts may
> assign varying weights to each of the factors depending on the facts presented, although,
> in many cases, the similarity of the marks, the defendant's intent, and actual confusion
> are particularly important.

*Packman*, 267 F. 3d at 643. Not only has Plaintiff demonstrated that Defendants' use of

Plaintiff's mark caused actual confusion among Plaintiff's and Defendants' customers and

business partners, Plaintiff has also shown that:

- the Defendants used Plaintiff's exact mark;

11

- the products were designed to look identical to the consumer;

- there was significant overlap between the parties' customers;

- Plaintiff (and PepperBall Technologies, Inc., before) was the dominant supplier of irritant powder filled projectiles in the United States; and

- Defendants intended to cause confusion by *inter alia*: intentionally choosing a color scheme for their products that was identical to Plaintiff's color scheme; repeatedly mentioning PepperBall in their announcements; and including PepperBall in hidden text and metatags on RAP4's website in order to drive consumers to their store by driving up RAP4's position with search engines.

Accordingly, a permanent injunction to prevent further harm resulting from Defendants' willful infringement of Plaintiff's trademark is appropriate. Moreover, Defendants' argument that the trademark has become generic is without merit.

**B. Plaintiff Has Established Defendants Engaged in Counterfeiting**

To establish a claim of counterfeiting, Plaintiff must how four things: (1) the mark must be "counterfeit," meaning "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark;" (2) the mark must be registered on the U.S. Patent and Trademark Office's principal register for use on the same goods or services for which the defendant uses the mark; (3) the defendant must not have been authorized to use the mark at the time the goods or services were manufactured or produced; and (4) the defendant must have acted with knowledge and intent. *See Coach, Inc. v. Diva's House of Style*, 2012 WL 6049722 at *8 (N.D. Ind. Dec. 5, 2012). Defendants used Plaintiff's trademark repeatedly in its two announcements and on its websites. Even in posting its "correction," RAP4 continued to

12

misrepresent that while Plaintiff had taken the PepperBall name and trademark, RAP4 was

selling an improved PepperBall, they just could not call it a PepperBall. Finally, there is no

dispute that RAP4 was selling a product that was passed off as being identical to a product

covered by a registered trademark which is owned by Plaintiff and which Plaintiff has never

given RAP4 permission to use. Therefore, if this case were to proceed to trial, Plaintiff is likely

to prevail on the counterfeiting claim.


**C.  Plaintiff Has Established Defendants Engaged in Deceptive Comparative Advertising**

In order to recover for deceptive comparative advertising under the Lanham Act, Plaintiff

must show five things:  "(1) the defendant has made false statements of fact as to its own

product, with such falsity stemming from actual misstatements, partially correct statements, or

failures to disclose; (2) there is actual deception or at least a tendency to deceive a substantial

section of the audience; (3) the deception must be material, in that it is likely to influence

purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a

likelihood of injury, stemming either from a decline in sales or loss in good will." *Ragold, Inc. v.*

*Ferrero, USA, Inc.*, 506 F. Supp. 117, 124 (N.D. Ill. 1980) (citations omitted).

As explained above, Defendants misrepresented the nature of their products and these

misrepresentations had a tendency to deceive a substantial section of the audience.

With respect to the third element, Plaintiff has presented substantial evidence that the

Defendants place significant value in Plaintiff's trademark and brand. First, when RAP4 began

selling the counterfeit projectiles obtained from APON via Sun, Defendants publicized the fact

that they had projectiles from the manufacturer of PepperBall projectiles. Even in their

"correction" announcement, the Defendants continue to use the term "PepperBall" and claim that

they have access to projectiles from the manufacturer of authentic PepperBall® projectiles.

Second, Defendants claimed that their projectiles---which were identical to PepperBall

projectiles the week before---were superior to those being produced by the Plaintiff and by

PepperBall Technologies, Inc., before it was liquidated. Third, Defendants claimed that their

projectiles were of superior quality and consistent availability (implying that Plaintiffs

projectiles are of lower quality and not consistently available).

With respect to the fourth and fifth elements, the Court heard the testimony of Eric

Bratten (Plaintiff's Vice President of Sales and Marketing) that the projectiles are shipped in

interstate and international commerce, and that Plaintiff's projectiles do not suffer from the

leakage demonstrated by Defendants' projectiles. Mr. Bratten also testified that Plaintiff lost at

least one sale worth approximately $20,000.

Given this evidence, Plaintiff is likely to prevail on the deceptive comparative

advertisement claim if this case were to proceed to trial.


**D.  Plaintiff has not Established that Defendants Misappropriated Trade Secrets**

To prevail on a claim for trade secret misappropriation a plaintiff must establish that: (1)

they have a trade secret; (2) the defendant misappropriated the trade secret; and  (3) the

defendant used the trade secret for business purposes. *See Composite Marine Propellers, Inc. v.*

*Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir. 1992) (interpreting the Illinois Trade Secret

Act (765 ILCS 1065/2(b)) which is identical to the Indiana Trade Secret Act (Ind. Code § 24-2-

3-2) in terms of defining what constitutes a "misappropriation."). "[U]nder the Indiana Uniform

Trade Secrets Act ("IUTSA"), either actual or threatened misappropriation of trade secrets may

be enjoined. Ind. Code § 24-2-3-3." *Standard Register Co. v. Cleaver*, 30 F. Supp. 2d 1084, 1094

(N.D. Ind. 1998).

While there was enough testimony to suspect Conrad Sun of misappropriating the pepper

powder formula and Plaintiff's customer list, which it received as part of the sale of Peppeball

Technologies Inc., there was no conclusive testimony that Defendants had either access to the

proprietary formula or Plaintiff's customer list. While RAP4 had a contractual agreement with

Sun to purchase the projectiles bearing the likeness of Plaintiff's projectiles, the contractual

obligation by itself does not expose the Defendants to liability under Plaintiff's trade secrets

claim.


V.

**A.  Injunctive Relief**

To obtain injunctive relief, a party must show: (1) actual success on the merits;

(2) that it does not have an adequate remedy at law; (3) the balance of harms between the parties

favors entering the injunction; and (4) entry of the injunction will not harm the public interest.

*CFM Majestic, Inc. v. NHC, Inc.*, 93 F. Supp. 2d 942, 958-59 (N.D. Ind. 2000) (citing *Chi. Sch.*

*Reform Bd. of Trustees v. Diversified Pharm. Servs. Inc.*, 40 F. Supp. 2d 987, 991 (N.D. Ill.

1999)).

"The Seventh Circuit has found that damages caused by trademark infringement and

dilution are by their very nature irreparable and are not susceptible to a remedy at law. *Id*. at 959

(citing *Porsche Cars N. Am.,, Inc. v. Manny's Porshop, Inc.*, 972 F. Supp. 1128, 1132 (N.D. Ill.

1997) (citing *International Kennel Club Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th

Cir.1988)). "The presumption is well-established in this circuit that injuries arising from Lanham

Act violations are irreparable, even absent a showing of business loss." *Id.* (quoting *Avent Am., Inc. v. Playtex Prod. Inc.*, 68 F. Supp. 2d 920, 932--33 (N.D. Ill. 1999) (quoting *Abbott Labs*, 971 F.2d at 16)). Applying the four factors to this case, the Court finds that Plaintiff is entitled to injunctive relief.

Accordingly, the Court enters a preliminary injunction against Defendants K.T. Tran and RAP4 as follows[2]:

For the duration of this case, Defendants K.T. Tran and RAP4 and their principals, officers, agents, servants, employees, attorneys, and affiliated companies or enterprises, and all persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are barred from:

(a)    manufacturing, shipping, selling or otherwise disposing of, or advertising or offering for sale projectiles filled with irritant causing powder that bear the likeness of the projectiles manufactured and sold by Plaintiff;

(b)    destroying, modifying, moving or disposing of any molds, tools or equipment for manufacturing said projectiles, or any business or personal records relating or referring to manufacture, sale, purchase, receipt, delivery, or transfer of the projectiles;

(c)    making or having made or causing or permitting to be made or used any molds for the manufacture of the projectiles filled with irritant causing powder that bear the

---

[2] The Court notes that Defendants' claims that, if preliminary injunction is entered, they will not be able to sell variety of other products not related to this case---for example, projectiles that neither have the likeness of Plaintiff's projectiles nor are filled with pepper powder---is of self-imposed nature. The preliminary injunction identifies clearly from what conduct Defendants are enjoined, and if they choose to construe the injunction broader than what is stated, such is their choice.

likeness of the projectiles manufactured and sold by Plaintiff, or setting up or

authorizing, or assisting the manufacture of such projectiles by any third party;

(d)     advertising, displaying or distributing products, literature, or any other materials

bearing the word PepperBall;

(e)     shipping, selling or filling orders for PepperBall® projectiles with any projectiles

other than genuine projectiles made by and obtained from Advanced Tactical

Ordnance Systems, LLC;

(f)     making any false statements, directly or indirectly, concerning Advanced Tactical

Ordnance Systems, LLC, PepperBall Technologies, Inc., or Phoenix International,

LLC, to any customers or potential customers of Advanced Tactical Ordnance

Systems, LLC or PepperBall Technologies, Inc.; or disparaging the good name

and business reputation of Advanced Tactical Ordnance Systems, LLC and/or

PepperBall Technologies, Inc.; or

(g)     making any false statements, directly or indirectly, concerning the availability of

authentic PepperBall® projectiles from Advanced Tactical Ordnance Systems,

LLC and PepperBall® Technologies.

It is further ordered that the Defendants are to immediately segregate and preserve, and to

permit Advanced Tactical Ordnance Systems, LLC, or its designated representatives to inspect

and inventor, all projectiles filled with irritant causing powder that bear the likeness of the

projectiles manufactured and sold by Plaintiff, all molds for making all projectiles filled with

irritant causing powder that bear the likeness of the projectiles manufactured and sold by

Plaintiff, and all other articles, literature, documents and materials used for making, advertising,

selling or distributing the projectiles filled with irritant causing powder that bear the likeness of

17

the projectiles manufactured and sold by Plaintiff, which are in the possession, custody or control of Defendants or their principals, officers, agents, servants, employees, attorneys or affiliated companies or enterprises.

Plaintiff has already posted bond and no additional security is required.


## VI.

The Clerk is directed to strike Plaintiff's Second Amended Motion for Preliminary Injunction (DE 323) and show as denied Defendants' motion objecting to Court's personal jurisdiction over them (DE 37). The Clerk is also ordered to show that Plaintiff's Amended Motion for Preliminary Injunction (DE 137) is granted.

In addition, the Court---

- grants leave to Plaintiff to file its Reply that is two pages over the page limit for replies (DE 340);

- denies Plaintiff's Motion to Strike (DE 342);

- denies Plaintiff's motion to amend the Temporary Restraining Order as moot (DE 306);

- orders the Clerk to term the original motion for preliminary injunction as moot (DE 31).


SO ORDERED on August 16, 2013.


S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE